1

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF TENNESSEE

3               WESTERN DIVISION

4    _____

5    UNITED STATES OF AMERICA,

6                Plaintiff,

7    vs.                                NO. 2:20-mj-00081

8    TERICA ELLIS,

9                Defendant.

10   _____

11

12

13            ID/REMOVAL/DETENTION HEARING

14            VIA SKYPE VIDEO RECORDING

15

16     BEFORE THE HONORABLE CHARMIANE G. CLAXTON, JUDGE

17

18                  WEDNESDAY

19             23RD OF SEPTEMBER, 2020

20

21

22

23            LISA J. MAYO, RDR, CRR
                OFFICIAL REPORTER
            FOURTH FLOOR FEDERAL BUILDING
24           MEMPHIS, TENNESSEE 38103

25

**UNREDACTED TRANSCRIPT**

1                 A P P E A R A N C E S

2

3

4

5       Appearing on behalf of the Plaintiff:

6            MICHELLE KIMBRIL-PARKS
             U.S. Attorney's Office
7            167 N. Main Street, Suite 800
             Memphis, TN 38103
8            (901)544-4231

9

10

11      Appearing on behalf of the Defendant:

12           MR. SCOTT HALL
             Law Office of Scott Hall
13           200 Jefferson Avenue, Suite 700
             Memphis, Tennessee 38103
14           Phone: (901) 522-1365

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

3

1

# W I T N E S S   I N D E X

2

**WITNESS**                                                 **PAGE**      **LINE**

DONALD THURMOND

| | PAGE | LINE |
|---|---|---|
| Direct Examination By Ms. Parks | 7 | 12 |
| Cross-Examination By Mr. Hall | 19 | 18 |
| Redirect Examination By Ms. Parks | 32 | 25 |

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        **E X H I B I T   I N D E X**

2  **EXHIBIT NUMBER                                PAGE      LINE**

3                            **NO EXHIBITS**

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        WEDNESDAY

 2                    September 2, 2020

 3

 4                ----------------------

 5

 6

 7           THE COURT:  United States versus Ellis for ID

 8  removal and detention hearings.

 9           Is everyone prepared to go forward?

10           MR. HALL:  Yes, Your Honor.

11           MS. PARKS:  Yes, Your Honor.

12           THE COURT:  Are we going forward on everything?

13           MR. HALL:  We're going to stipulate as to

14  identification, Judge.

15           THE COURT:  Okay, all right.  So we're good on ID

16  and it's now just a question of removal and detention?

17           MR. HALL:  That is correct, Your Honor.

18           THE COURT:  All right.  And Ms. Parks, if you're

19  ready to proceed.

20           MS. PARKS:  Yes, Your Honor.  The Government has

21  one witness.  It's Detective Donny Thurmond.  I believe Your

22  Honor can see him on the screen.

23           THE COURT:  And before we get started, good

24  afternoon Ms. Ellis.

25           THE DEFENDANT:  Good afternoon, Your Honor.
```

**UNREDACTED TRANSCRIPT**

1          THE COURT:  And is it all right with you if we

2    have this hearing by video this afternoon?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  All right, thank you, ma'am.  Thank

5    you very much.  All right, please continue, Ms. Parks.

6          MS. PARKS:  Permission to proceed, Your Honor?

7          THE COURT:  Yes, ma'am.

8    BY MS. PARKS:

9     Q.   Could you please state your name for the record --

10         THE COURT:  Before of course I believe we need to

11   swear him in.

12         MS. PARKS:  I'm sorry.

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1                    *   *   *

2

3                    **DONALD THURMOND,**

4    **was called as a witness and having first been duly sworn**

5    **testified as follows:**

6              **THE COURT:**  And if you would state and spell your

7    first and last name, sir, for the record.

8              **THE WITNESS:**  Donald Thurmond, D-O-N-A-L-D,

9    Thurmond, T-H-U-R-M-O-N-D.

10             **THE COURT:**  Thank you, sir.  You may continue,

11   Ms. Parks.

12                    **DIRECT EXAMINATION**

13   **BY MS. PARKS:**

14   Q.   Detective Thurmond, where are you employed?

15   A.   St. Louis Metropolitan Police Department.

16   Q.   How long have you been so employed?

17   A.   Approximately 17 years.

18   Q.   And did you participate in an investigation of a

19   homicide involving victim Andre Montgomery?

20   A.   Yes, I did.

21   Q.   And Mr. Montgomery also goes by the name of Dre?

22   A.   Correct.

23   Q.   And when was the victim killed?

24   A.   March 14, 2016.

25   Q.   Was that approximately 8:02 p.m.?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    8

1    A.    Yes.

2    Q.    And where was the victim killed?

3    A.    I believe it was 3964 Natural Bridge.

4    Q.    And is that in St. Louis, Missouri?

5    A.    Yes, it is.

6    Q.    Now at the scene of the homicide did officers locate a

7    cell phone near the victim's body?

8    A.    Yes.

9    Q.    Was a forensic examination conducted of that cell

10   phone?

11   A.    Yes.

12   Q.    And were you able to identify the owner of the cell

13   phone?

14   A.    Yes.

15   Q.    And who did the cell phone belong to?

16   A.    The victim Andre Montgomery.

17   Q.    And during that examination, did you determine with

18   whom the victim spoke to prior to his death?

19   A.    Yes.

20   Q.    And in particular, did it involve two numbers, one

21   ending in 4415 and the second number ending in 5151?

22   A.    Yes.

23   Q.    And were you able to identify the user of those two

24   cell phones?

25   A.    Yes.

**UNREDACTED TRANSCRIPT**

1    Q.    And who was the user?

2    A.    Ms. Terica Ellis.

3    Q.    Now did you attempt to get subscriber information with

4    regards to the 4415 number?

5    A.    Yes.

6    Q.    And what if anything did you determine in your

7    investigation of the owner of that cell phone?

8    A.    It was a prepaid cell phone.

9    Q.    And when was it activated?

10   A.    The day of the murder.

11   Q.    Now when you examined the victim's phone, did you

12   observe text messages between the victim and Ellis utilizing

13   the phone number ending in 5151?

14   A.    Yes.

15   Q.    What if anything of significance was obtained from

16   those text messages?

17   A.    Ms. Ellis advised Mr. Montgomery that she was heading

18   back to Memphis and that she would be back March 10th of

19   2016, and --

20   Q.    I'm sorry.  When you said she would be back March

21   10th, where was she going to?

22   A.    I'm sorry; back to St. Louis.

23   Q.    And where was Mr. Montgomery at that time?

24   A.    I believe he was in St. Louis.

25   Q.    Okay.

**UNREDACTED TRANSCRIPT**

1   A.   He may have been in Texas.

2   Q.   Okay.  Anything else of significance with regards to

3   those text messages?

4   A.   Yes.  She provided Mr. Montgomery with her Instagram

5   account name, Alexis Degray.  She also advised him that he

6   could delete her other number, the 5151 number, and save the

7   4415 as her new number.

8   Q.   Now on the day of the homicide was there a text

9   message between Ellis and the victim Montgomery?

10  A.   I'm sorry?

11  Q.   On the day of the murder, was there a text message

12  between the victim and Ms. Ellis?

13  A.   Yes.

14  Q.   And what was the nature of that message?

15  A.   I believe that message was -- refer to my notes -- he

16  texted her the address of his location.

17  Q.   And is that the location he was ultimately found shot

18  to death?

19  A.   Yes.

20  Q.   Now did you obtain location information for

21  Ms. Ellis's phone on the day of the murder?

22  A.   Yes.

23          **MS. PARKS:**  Judge Claxton, are you still there?

24  Your video went out.

25          **THE COURT:**  Oh, I'm sorry.  Yes, I'm here.

**UNREDACTED TRANSCRIPT**

1          **MS. PARKS:**  I'm sorry.  I just wanted to make

2  sure you were.  Okay.

3  BY MS. PARKS:

4    Q.   You indicated that you obtained location information

5  of Ms. Ellis's telephone, correct?

6    A.   Correct.

7    Q.   And what if anything did that reveal?

8    A.   That she was in the location of the murder at the time

9  of the murder and immediately following the homicide she was

10  southbound on 55, heading toward Memphis.

11    Q.   And what about -- and I'm just going to refer to it as

12  a burner phone -- the number ending in 4415?  Did you learn

13  about how long that phone remained active after the murder?

14    A.   Yes.  It was actually deactivated the day after, on

15  March 15th.

16    Q.   Now did you also receive toll records associated with

17  Ellis's phone?

18    A.   Yes.

19    Q.   And toll records will basically tell you incoming and

20  outgoing calls, correct?

21    A.   Correct.

22    Q.   And what if anything of significance did the toll

23  records reveal?

24    A.   After she learned the location of Mr. Montgomery she

25  contacted James Timothy Norman.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    12

1    Q.    And what if any relationship does James Timothy Norman

2    have to the victim Mr. Montgomery?

3    A.    He is the victim's uncle.

4    Q.    What if any relationship does Norman have to Ellis?

5    A.    It was a sexual relationship.

6    Q.    And did you obtain location information for Norman's

7    phone?

8    A.    Yes.

9    Q.    And what did that location information reveal?

10   A.    That he and Ms. Ellis were in the same area of the

11   hotel he was staying at, the Chase Park Plaza here in St.

12   Louis.

13   Q.    And that was the day of the murder?

14   A.    Correct.  Also, early morning after the murder he left

15   St. Louis and flew back to Los Angeles.

16   Q.    And is Los Angeles Norman's or was that Norman's place

17   of residence at the time?

18   A.    Yes.

19   Q.    Were you able to determine when Norman arrived in St.

20   Louis?

21   A.    Yes.  It was the early morning of March 14th, just

22   after midnight.

23   Q.    And how were you able to determine that?

24   A.    Flight records.

25   Q.    Were you also able to determine when Norman left

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                                13

1   St. Louis?

2   A.   Yes.  It was the early morning of March 15th, the

3   morning after the murder.

4   Q.   So he arrived the day of and left the morning after?

5   A.   Correct.

6   Q.   And he was staying at a hotel in St. Louis?

7   A.   Correct.

8   Q.   Did you learn during this investigation that Norman

9   had taken out insurance policies on the victim,

10  Mr. Montgomery?

11  A.   Yes.

12  Q.   Did your investigation reveal what if anything Ellis

13  received in return for her involvement in this homicide?

14  A.   Yes, approximately $10,000.

15  Q.   Was a financial investigation conducted of Ms. Ellis's

16  bank account?

17  A.   Yes.

18  Q.   And what did that reveal?

19  A.   The days after the murder she deposited approximately

20  $9,200.

21  Q.   In cash?

22  A.   Correct.

23  Q.   Based on this evidence in part, did a criminal

24  complaint file against Ms. Ellis on July 8th of 2020?

25  A.   Yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    14

1    Q.    And did you participate or were you aware of her

2    arrest on August 17th of 2020?

3    A.    Yes.

4    Q.    And where did that arrest take place?

5    A.    At her residence in Olive Branch, Mississippi.

6    Q.    At the time of the arrest was she represented by

7    counsel?

8    A.    Yes.

9    Q.    Was she advised of her rights?

10   A.    Yes.

11   Q.    Did she waive those rights and agree to give a

12   statement to police?

13   A.    Yes.

14   Q.    And was that statement video recorded?

15   A.    Yes.

16   Q.    Did she tell investigators what her relationship was

17   with the victim at that time?

18   A.    Yes.

19   Q.    And what was that relationship or how did she meet the

20   victim, Mr. Montgomery?

21   A.    She met Mr. Montgomery she was working at a strip club

22   she was working at called The Bottoms Up where they exchanged

23   phone numbers.

24   Q.    And was that in St. Louis?

25   A.    East St. Louis.

**UNREDACTED TRANSCRIPT**

1    Q.   And can you advise the Court of what she told you

2    occurred on the day of the homicide?

3    A.   Yes.  She received a message from Mr. Norman to meet

4    at his hotel.  She responded to the hotel where she met and

5    they had sex, showered.  Mr. Norman asked her if she knew Mr.

6    Montgomery.  She stated she did after she observed the

7    photograph that Mr. Norman showed her.  He requested her

8    assistance with locating him after he notified her of a

9    burglary that occurred at his mother's residence where

10   approximately $200,000 in cash was stolen, and advised her

11   that he would pay her for her assistance.

12        At the time she told us that she received $5,000 to do

13   this.  It was later determined after she was confronted with

14   evidence that she said it was actually $10,000.  She and

15   Mr. Norman went to Walgreen's that was close to the hotel

16   where she obtained two burner phones, prepaid cell phones.

17   He put in a phone number for her to contact once he was able

18   to locate Mr. Montgomery.

19        She did contact Mr. Montgomery and met him at a hotel

20   called La Quinta Inn which is in St. Louis County.  She

21   contacted Mr. Norman and told him that she was able to obtain

22   his location.  Mr. Norman advised her that his boys were not

23   ready at that time, to stay in touch and to call the number

24   that he placed in her cell phone, the burner phone, when he

25   got another -- she got another location.

**UNREDACTED TRANSCRIPT**

1        She actually advised that she responded to La Quinta

2    hotel where she met with Mr. Montgomery.  She later left,

3    went to the Galleria Mall which is located in Brentwood,

4    Missouri where she purchased a pair of pants for

5    Mr. Montgomery.  He then contacted her and gave his location

6    on Natural Bridge where the murder occurred.  She then

7    contacted the other phone number that was in the burner

8    phone, advising the individual on the other line of his

9    location.  She could only describe him as having a deep

10   voice.

11       She then responded to the house on Natural Bridge

12   where Mr. Montgomery was, again, contacting that phone number

13   advising that she was there with Montgomery.

14       Mr. Montgomery exited the house, entered her vehicle.

15   They spoke for approximately two minutes where she gave him a

16   pair of pants.  As soon as he exited the vehicle, she advised

17   us she received a phone call telling her to leave, which was

18   later proven to be false.  She then pulled away from the

19   residence when she heard gunshots and immediately got on the

20   highway to head back to Memphis.

21       Immediately following the homicide, though, she

22   contacted Mr. Norman, advising him of what happened.

23   Mr. Norman advised her to dump the cell phone and stay out of

24   St. Louis.

25   Q.   Did she ever call the police?

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                                17

1    A.   No.

2    Q.   Did she dump the cell phone to your knowledge?

3    A.   She did.  She advised that she did at a gas station

4  which was at an unknown location.

5    Q.   After the murder did she have any further contact with

6  Mr. Norman?

7    A.   Yes.  Her, her mother and her daughter flew out to

8  Los Angeles, California where they met with Mr. Norman and

9  had dinner.

10   Q.   Do you know approximately when that was?

11   A.   It was days after, maybe three days after, about a

12  week after.

13   Q.   Now during the interview that you had with Ms. Ellis

14  on August 17th, did she indicate who she was staying with in

15  St. Louis at the time of the murder?

16   A.   It would have been one of her friends, Shontae Cruise

17  or Rolanda -- I'm sorry, Shontae Griffin or Rolanda Cruise.

18   Q.   Now after she was arrested, did you go and -- did

19  investigators review her Facebook accounts?

20   A.   That's in the process.

21   Q.   Have y'all done any initial cursory review of her

22  accounts to see if she's had any contact with anybody since

23  she's been locked up?

24   A.   Yes.  There was messages to Ms. Griffin and

25  Mrs. Cruise.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                      18

1   Q.    And two individuals she was staying with during the

2   time of the homicide?

3   A.    Correct.

4   Q.    But at this point you don't know the nature of those

5   messages, correct?

6   A.    I don't have those at this time.

7   Q.    Do you know the last time that Ms. Ellis had

8   communications with Mr. Norman?

9   A.    When we interviewed her, I believe she advised us it

10  was a month prior to her arrest.

11  Q.    So about July of 2020?

12  A.    Correct.

13  Q.    Are you aware of Ms. Ellis's current employment?

14  A.    I believe she owns her own business.

15  Q.    Did she indicate any other source of income during

16  your interview?

17  A.    She did.  She received money from being an exotic

18  dancer.

19  Q.    Did she indicate to you that she still dances, she

20  still makes money as an exotic dancer?

21  A.    I don't recall that actually.

22  Q.    Okay.  On August 20th of this year, did a federal

23  grand jury in the Eastern District of Missouri indict both

24  Norman and Ellis for violations of 18 USC Section 1958?

25  A.    Yes.

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                         19

1          MS. PARKS:  If I could have just a moment, Your

2    Honor.

3               THE COURT:  Yes, ma'am.

4    BY MS. PARKS:

5     Q.   Detective Thurmond, do you see Ms. Ellis on the

6    monitor today?

7     A.   I do.

8     Q.   Could you point her out, just describe something that

9    she's wearing?

10    A.   She's wearing a yellow jumpsuit, I believe it's a

11   white mask; and her video says West Tennessee Guest.

12    Q.   And is that the individual you participated in the

13   interview on on August 17th?

14    A.   Yes.

15          MS. PARKS:  I pass the witness, Your Honor.

16          THE COURT:  Cross, Mr. Hall?

17          MR. HALL:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19   BY MR. HALL:

20    Q.   Good afternoon, Detective Thurmond.  My name is Scott

21   Hall and I represent Ms. Ellis.

22    A.   Good afternoon, Mr. Hall.

23    Q.   Thank you, sir.

24         Were you assigned to this homicide investigation back

25   in 2016 at the time it happened?

                    UNREDACTED TRANSCRIPT

**TESTIMONY OF D. THURMOND**                                          20

1    A.   No, I was not.

2    Q.   When did you first become involved in this

3    investigation?

4    A.   When my partner Dave Rudolph, he was passed the

5    investigation after the initial investigator was transferred

6    out of homicide.  Last year.

7    Q.   Okay.  Last year?

8    A.   Correct.

9    Q.   Okay.  So for about a year now you've been on the

10   case, right?

11   A.   Correct.

12   Q.   And prior to August 17th, 2020, which is just a few

13   weeks ago, you were present and you conducted the questioning

14   of Ms. Ellis; is that correct?

15   A.   Prior to August 17th?

16   Q.   No, on August 17th.  Did you -- were you the officer

17   that was questioning Ms. Ellis?

18   A.   I was present during the questioning.  I asked some

19   questions.  My partner did most of the questioning.

20   Q.   And was she also questioned by FBI agents in your

21   presence?

22   A.   Yes.

23   Q.   Okay.  And during that time period, was that the first

24   time since 2014 or, excuse me, March 14, 2016, that Ms. Ellis

25   was questioned by anyone in law enforcement regarding this

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                        21

 1   homicide?

 2     A.    To my knowledge, yes.

 3     Q.    And to your knowledge, had anyone ever attempted to

 4   pick Ms. Ellis up or attempt to talk to her about this crime

 5   until the 17th of this year, of August?

 6     A.    Not to my knowledge.

 7     Q.    Now, you testified that Ms. Ellis was represented by

 8   an attorney at the time that you questioned her and the time

 9   she was questioned in your presence; is that correct?

10     A.    Correct.

11     Q.    Do you recall that attorney's name?

12     A.    I do not remember her name.

13     Q.    And was this an attorney based out of Memphis?

14     A.    I believe out of St. Louis.

15     Q.    Out of St. Louis.

16           And was this an attorney from the public -- the

17   Federal Public Defender's Office in St. Louis?

18     A.    I believe so.

19     Q.    Was that attorney present at the time Ms. Ellis was

20   arrested?

21     A.    At her residence?

22     Q.    Yes.

23     A.    I don't believe so.

24     Q.    Did that attorney travel from St. Louis to Memphis

25   with you and other agents?

                    **UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                    22

1    A.    Not with us, no.

2    Q.    Do you know how that attorney was appointed to

3  represent Ms. Ellis?

4    A.    I believe through the AUSA's office here in St. Louis.

5    Q.    So the prosecutor's office there in St. Louis, they

6  didn't appoint the attorney.  Do you know how they got an

7  attorney for Ms. Ellis?

8    A.    I was not involved in that process.  I don't.

9    Q.    So it's to your understanding the US Attorney's Office

10 in St. Louis after this complaint was filed went and got an

11 attorney to be appointed for Ms. Ellis?

12   A.    I believe so.

13   Q.    Okay.  And then that attorney came to Memphis at the

14 same time period that you guys came down here to make the

15 arrest?

16   A.    Correct.

17   Q.    From the time Ms. Ellis was arrested how long was it

18 until you had her in an interview room speaking with her

19 regarding these statements that you say she made after her

20 arrest?  How long was that gap?

21   A.    Between one and two hours.

22   Q.    Okay.  And at any point in time during that period did

23 Ms. Ellis meet with her attorney alone without the presence

24 of law enforcement officers?

25   A.    Yes.

                    **UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    23

1    Q.    And when you -- you testified that you -- when you

2    reviewed this file -- I know you just got on it last year and

3    this investigation has been going for some time -- but you

4    became real familiar with all the facts and all the evidence

5    in this case as soon as you got on it, right?

6    A.    Yes.

7    Q.    And the phone numbers that you testified about, the

8    specific -- I won't go over the full number -- but the one

9    ending in 4415, you stated that that was a burner phone or

10   track phone that was a prepaid cellular device; is that

11   correct?

12   A.    Correct.

13   Q.    And were you able to track the purchase of that phone

14   to who actually made that purchase, who actually bought that

15   phone; or is that information that was provided to you by

16   Ms. Ellis?

17   A.    That was information provided to me by Ms. Ellis.

18   Q.    Okay.  And the number 5151, that's the number you said

19   was linked to an Instagram account that was linked to

20   Ms. Ellis; is that correct?

21   A.    No.  That's the number that she provided

22   Mr. Montgomery the Instagram account name of.

23   Q.    Okay.  And I'm curious because that was all known to

24   law enforcement back in 2016 but she wasn't questioned

25   regarding anything in this case until this year.  Do you know

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                      24

1    why it took so long to develop Ms. Ellis as a suspect in this

2    case?

3       A.    It was an ongoing investigation.

4       Q.    Okay.  And you stated that there was a phone number

5    that was tracked -- that was after Mr. Montgomery was shot

6    that you tracked the number ending in -- was the number

7    ending in 5151 or the number ending in 4415 that you tracked

8    on I-55 South after the homicide?

9       A.    4415.

10      Q.    So the burner phone was the phone that you tracked or

11   pinged its location?

12      A.    Correct.

13      Q.    And the ping or the location monitor that placed that

14   phone at the Chase Park Plaza hotel, that number was also

15   tracked alongside the number that you associated with Mr. Tim

16   Norman; is that correct?

17      A.    Correct.

18      Q.    Who was able to confirm -- did Ms. Ellis -- was it Ms.

19   Ellis that was able to confirm for you that those two track

20   device numbers were the one that she and Mr. Norman used on

21   that day of the homicide?

22      A.    She was.

23      Q.    Okay.  And so prior to -- and I've read the Complaint

24   and I know Your Honor has probably read this Complaint.  Did

25   you help prepare the Complaint in this case that was filed by

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                                 25

1  the Special Agent Faber, Christopher Faber?

2      A.    No, I was not.

3      Q.    Okay.  So you weren't a part of that.  Have you

4  reviewed that Complaint during your investigation?

5      A.    Not entirely.

6      Q.    Okay.  So all of the information in that Complaint you

7  can't just really testify to its accuracy or you didn't

8  prepare it in other words?

9      A.    Correct.

10     Q.    Okay.  When you got Ms. Ellis on -- when you arrested

11 Ms. Ellis on August 17th, 2020, were you present at the time

12 of that arrest at her residence?

13     A.    No, I was not.

14     Q.    And where was she taken to immediately following that

15 arrest?

16     A.    Southaven, I believe their sheriff's department.

17     Q.    Okay.  And in your investigation I believe you

18 testified earlier that Mr. Tim Norman, he was the -- he

19 obtained a life insurance policy on his nephew Andre

20 Montgomery; is that correct?

21     A.    Correct.

22     Q.    It was about -- to the tune of about $450,000?

23     A.    Correct.

24     Q.    And this is the same Tim Norman that's the reality TV

25 show star of Welcome to Sweetie Pie's, right?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                          26

1     A.    Correct.

2     Q.    And which were ran on the Oprah Winfrey network for

3     about five years; is that correct?

4     A.    I believe so.

5     Q.    And when Ms. Ellis advised you that she met Tim Norman

6     you said at the Bottom's Up strip club in St. Louis; is that

7     right?

8     A.    No.  That's where she met Mr. Montgomery.

9     Q.    Okay.  Did she state where she met Mr. Norman?

10    A.    They met around 2011 or '12 through mutual friends.

11    Q.    And was that while she was a performing dancer in

12    St. Louis?  Do you know?

13    A.    I believe so.

14    Q.    Okay.  And, to your knowledge, has your investigation

15    revealed that Ms. Ellis had any knowledge that this life

16    insurance policy was issued with Tim Norman being the

17    beneficiary?

18    A.    I don't believe so.

19    Q.    So your investigation basically doesn't indicate that

20    Ms. Ellis ever knew about this insurance policy?

21    A.    I don't recall that, no.

22    Q.    Okay.  And when you spoke with Ms. Ellis, she did not

23    tell you that she had an understanding with Mr. Norman or

24    anyone else involved in this case that Mr. Montgomery was

25    going to be killed, did she?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    27

 1    A.    I'm sorry; can you ask that one more time?

 2    Q.    When you spoke with Ms. Ellis during her statement,

 3   she never indicated to you or any other agents in your

 4   presence that she knew or understood that Mr. Montgomery was

 5   going to be killed on March 14 of 2016, did she?

 6    A.    She was under the understanding that she was supposed

 7   to locate him so his "boys can get up on him" is what she

 8   used.

 9    Q.    Okay.  And the reason that she stated to you -- and I

10   don't know if you were able to confirm this during your

11   independent investigation -- but was that Mr. Norman advised

12   Ms. Ellis that Andre Montgomery had burglarized Mr. Norman's

13   home and stole about $200,000 in cash; is that correct?

14    A.    Correct.

15    Q.    And did Ms. Ellis advise you that Mr. Norman was

16   seeking her assistance in locating Mr. Montgomery in an

17   effort for Mr. Norman to obtain or get back a portion of that

18   $200,000?

19    A.    Correct.

20    Q.    And did you through independent investigation, were

21   you able to corroborate that Mr. Norman in fact was

22   burglarized -- that there was a burglary?

23    A.    Yes, there was.

24    Q.    Okay.  And was Andre Montgomery ever a suspect in that

25   burglary?

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                    28

1    A.   He was.

2    Q.   Okay.  So to your knowledge and through your

3    investigation that story by Mr. Norman to Ms. Ellis that

4    Andre was involved in a burglary was true for the most part?

5    A.   Correct.

6    Q.   Okay.  Now on the date -- let me go back to the

7    questioning when Ms. Ellis gave you the statement.  Did she

8    ever provide the name of the individual that called her and

9    told her to drive away once Mr. Montgomery exited the vehicle

10   outside the studio on Natural Bridge Road?

11   A.   She did not because that phone call never existed.

12   Q.   Okay.  Okay.  You're saying that the phone call to

13   drive away from the location never existed?

14   A.   Correct.

15   Q.   You were able to -- I guess a basic check of the phone

16   records from the number that she provided or the number

17   that -- the track phone number I suppose is the number we're

18   talking about, the one ending in 4415; you didn't see a phone

19   call coming in, that's why you're saying that that

20   information was not correct?  Is that correct?

21   A.   Yes.

22   Q.   Okay.  And -- but there were numbers that were

23   associated with that phone.  Was there a number other than

24   the number that you associated with Tim Norman's track phone

25   that called that phone that Ms. Ellis was purported to have

**UNREDACTED TRANSCRIPT**

1   had that day?

2     A.    Mr. Norman didn't have a track phone.  The second

3   purchased track phone was given to another individual -- I'm

4   sorry.  Yeah, there were other phone calls on that track

5   phone with Mr. Montgomery and Mr. Norman and that other

6   individual.

7     Q.    Okay.  All right.

8           And before Ms. Ellis was interviewed, did she seem

9   cooperative during this interview?

10    A.    For the most part.  There were times that she was not

11  being forthcoming or truthful.

12    Q.    Okay.  And but she -- were there any threats made by

13  law enforcement.  Not threats.  I'll rephrase that.  That's

14  not a fair way to rephrase it.

15          Were there any statements made to Ms. Ellis by law

16  enforcement that it was law enforcement's belief that Tim

17  Norman would have her killed?

18    A.    I don't recall that.

19    Q.    Were there any statements -- were there any statements

20  made -- you're saying you don't recall or are you saying it

21  didn't happen?

22    A.    I just don't recall that.

23    Q.    Were you present during the entire time that Ms. Ellis

24  was questioned by the FBI and other agents?

25    A.    Yes.

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                                    30

1    Q.   Okay.  And were there any other statements made

2    that -- to -- not any other, but did you witness any

3    statements at all made to Ms. Ellis by FBI, by St. Louis

4    Metro in relation to her life being at risk in this case if

5    she was not truthful and forthcoming with information?

6    A.   I believe so.

7    Q.   Okay.  Now if it was your understanding that Ms. Ellis

8    had no information about the insurance policy, was Ms. Ellis

9    told that if she was truthful in this case -- I'll rephrase.

10        If Ms. Ellis -- during this interview, was she ever

11   told that if she was truthful and cooperative and provided

12   information that you guys could confirm to be true, that she

13   would be granted a bond in this federal case?

14   A.   I did not hear anyone say that.

15   Q.   Okay.  And up until this August 17th, 2020 arrest,

16   there had been no other attempts to your knowledge to locate

17   Ms. Ellis or connect her with this case?

18   A.   Not to my knowledge.

19   Q.   So when Ms. Ellis came in and sat down with you guys,

20   she provided a lot of helpful information that filled in some

21   gaps on this case.  Would you agree with that?

22   A.   She verified some information but there were also some

23   things that she said that were just untruthful.

24   Q.   But she did admit to you that Mr. Norman paid her

25   $10,000 for her effort and for her participation in getting

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                      31

1   Mr. Montgomery to come outside of the studio that he was at,

2   right?

3      A.   The second time around, yes, she did.  First time she

4   said $5,000, and then the second time she did tell us 10,000,

5   which is something we pretty much already knew.

6      Q.   But in this case there were no -- other than these

7   phone numbers that you had, the numbers relating to

8   Mr. Norman, the numbers relating to Ms. Ellis, the track

9   phone numbers, other than having those phone numbers and

10  showing communications between those particular devices, you

11  didn't -- you couldn't state with certainty who was on those

12  phone calls and who was making those texts until Ms. Ellis

13  filled those blanks in; is that correct?

14     A.   No.  We already had that information.

15     Q.   Okay.  At the time Ms. Ellis was arrested here in

16  Memphis, did she come along cooperatively?  She didn't

17  attempt to flee or run or anything of that nature?

18     A.   That's correct.

19          **MR. HALL:**  Your Honor, I'm almost finished, Your

20  Honor.  I'm just reviewing my notes for one second, if you

21  would please.

22          **THE COURT:**  Okay.

23          **MR. HALL:**  Thank you.

24  BY MR. HALL:

25     Q.   Detective Thurmond, I believe you stated that your

**UNREDACTED TRANSCRIPT**

TESTIMONY OF D. THURMOND                                      32

1    review of the phone numbers that you associated with

2    Ms. Ellis, 4415 last four numbers and 5151, that there was a

3    text to Mr. Montgomery that she would be -- that Ms. Ellis

4    would be back in St. Louis on March 10, 2016.  Is that

5    correct?

6        A.   Correct.

7        Q.   So that would have been approximately four days prior

8    to Mr. Montgomery's homicide?

9        A.   Correct.

10       Q.   Okay.  And to your information and through your

11   investigation, did that -- was that the approximate time that

12   she arrived back in St. Louis was on March 10th of 2016?

13       A.   From what she informed us, yes.

14       Q.   Okay.  And you stated that the records indicated -- I

15   guess the airline records indicated that Mr. Norman did not

16   arrive in St. Louis until the early morning hours, just a

17   little after midnight on March 14th, the day that

18   Mr. Montgomery was killed?

19       A.   Correct.

20       Q.   Okay.

21            MR. HALL:  Judge, I don't believe I have any

22   other questions at this time.

23            THE COURT:  All right.  Redirect?

24            MS. PARKS:  Yes, Your Honor.  Thank you.

25                    REDIRECT EXAMINATION

                    UNREDACTED TRANSCRIPT

**TESTIMONY OF D. THURMOND**                                           33

1    **BY MS. PARKS:**

2    Q.   Detective Thurmond, has an individual ever lied to you

3    during an interrogation?

4    A.   Yes.

5    Q.   And you testified that she was not completely

6    forthcoming during your interview of her, correct?

7    A.   Correct.

8    Q.   Now, there's been distinctions made about what was

9    known prior to her interview and things that were learned

10   after her interview, but this complaint was drafted in July

11   of 2020, correct?

12   A.   Correct.

13   Q.   Which contained information as to the individuals

14   associated with these various cell phones, correct?

15   A.   Correct.

16   Q.   Including the defendant, Ms. Ellis, and her

17   codefendant Mr. Norman, correct?

18   A.   Correct.

19   Q.   And you also had location information showing them in

20   the same general area during the time of the homicide,

21   correct?

22   A.   Correct.

23   Q.   Even showing them coming and going from St. Louis

24   after the homicide, correct?

25   A.   Correct.

TESTIMONY OF D. THURMOND                                    34

1    Q.   And the defense attorney has suggested that when she

2    was arrested in Olive Branch she did not attempt to flee law

3    enforcement, correct?

4    A.   Correct.

5    Q.   But after the homicide, what did she do?

6    A.   She fled St. Louis.

7    Q.   And location information showed her in what city?

8    A.   After the homicide?

9    Q.   Correct.

10   A.   Back in Memphis.

11   Q.   And so, in essence, what was learned in her statement

12   that she gave corroborated some of the information that was

13   already known to law enforcement, correct?

14   A.   Correct.

15   Q.   And when the defense attorney suggests that she did

16   not know for what purpose Mr. Norman or what Mr. Norman's

17   intentions were when he indicated and I think you said "boys

18   can get up on" the victim, she didn't -- did not know for

19   what purpose that was the purpose.  Do you understand my

20   question?

21   A.   I believe she knew the purpose, that along with the

22   $10,000, burner phones being used, I believe she knew the

23   purpose.

24   Q.   And did you testify who she contacted after the

25   murder?  Did she notify of any shots fired in the area that

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF D. THURMOND**                                    35

1   she just departed?

2     A.    No.   She did not contact 9-1-1, notify anybody.   The

3   only phone call she made was to Mr. Norman.

4     Q.    And in the four years since this homicide has she made

5   any efforts of contacting law enforcement about what occurred

6   that day?

7     A.    No.

8     Q.    And you've indicated that she continues to remain in

9   contact with Mr. Norman as of July of this year, correct?

10    A.    Correct.

11              **MS. PARKS:**   I have nothing further, Your Honor.

12              **THE COURT:**   All right, thank you, Detective.   We

13  appreciate your testimony today.

14              **THE WITNESS:**   Thank you, ma'am.   You have a great

15  day.

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

1       **THE COURT:**  Any further proof, Ms. Parks?  Any

2   further proof, Ms. Parks?

3       **MS. PARKS:**  No, Your Honor.

4       **THE COURT:**  Mr. Hall, any proof?

5       **MR. HALL:**  Not at this time, Your Honor.  I would

6   just acknowledge who is present in my office at this time, if

7   that's okay with the Court.

8       **THE COURT:**  Sure.

9       **MR. HALL:**  Mr. Fred Boler is present in the

10   court, Your Honor.  He is Ms. Ellis's father.  And her mother

11   is also present in the court.  And I was looking for -- there

12   is other people here as well, Your Honor, that's related to

13   her, her aunt and the cousin but Sonia Evans is her mother.

14   Just acknowledgment that that's who is here in the office

15   with me for support of Ms. Ellis, Your Honor.

16       **THE COURT:**  Thank you, sir, and I'm sure

17   Ms. Ellis appreciates their appearance today and their

18   support.

19       Argument, Ms. Parks?

20       **MS. PARKS:**  Yes, Your Honor.  First, Your Honor,

21   I would just note for the Court that this is a presumption

22   case in light of the nature of the offense and the penalty

23   for which Ms. Ellis is facing.  I would submit to the Court

24   that the defense has not overcome that presumption.  They've

25   put no evidence on at all to rebut the presumption, but even

**UNREDACTED TRANSCRIPT**

37

1    if the Court were to consider that they had in fact rebutted

2    the presumption, I would submit that the factors set out in

3    ^  3142(g) do not support her being released at this time,

4    but rather that she be detained.

5            With regards to the nature and circumstances of

6    the offense, on March 14th of 2016, a 20-year-old individual

7    was shot and killed in St. Louis, Missouri.  The defendant is

8    charged along with Mr. Norman with that individual's death or

9    her involvement in that individual's death, and I think the

10   testimony has been that it was Ms. Ellis that lured the

11   victim out of the house, contacted the individuals that were

12   going to carry out this offense, upon their arrival, departed

13   the city of St. Louis and fled to Memphis.  I would submit to

14   the Court that the nature and the circumstances of this

15   offense weigh in favor of detention.

16           With regard to the weight of the evidence, I

17   would submit the evidence is strong and we'll rely on the

18   facts that were set out in the indictment, the Affidavit of

19   the Complaint as well as the testimony of Detective Thurmond.

20           The history and characteristics of the Defendant,

21   Your Honor, I would just -- I would submit to the Court that

22   although she has a limited criminal history, she has very

23   limited employment as well.

24           The nature and seriousness of the danger to the

25   community, just relying on the nature and circumstances and

**UNREDACTED TRANSCRIPT**

1    facts against, Your Honor, I would submit to the Court that

2    an individual who engages in this kind of activity, is able

3    to walk away from that for $10,000 without any regrets at

4    all, I would submit to the Court suggests that she dispose a

5    danger to the community.  She fled the city of St. Louis and

6    came back to Memphis and resumed her life as if nothing had

7    occurred, but yet, continues to remain in contact with the

8    individual responsible for setting this up, Mr. Norman.

9         I would submit that Ms. Ellis is also a flight

10   risk.  Prior to this offense -- well, actually during and

11   around this offense, she had prior bench warrants out of

12   Shelby County.  She had a failure to appear warrant out of

13   Bartlett and she has an active warrant out of Eastern

14   District of Missouri.  And also, I would just direct the

15   Court back to the testimony with regards to her acts after

16   the murder.  She fled the city of St. Louis.  She currently

17   has absolutely no ties to St. Louis, Missouri, so I submit to

18   the Court that she dispose a risk of flight.

19        Again, Your Honor, it is in the Government's

20   position that the Defendant has not overcome the burden in

21   this case, and ask the Court to detain her, but nevertheless,

22   I would submit that considering all these factors, it does

23   suggest that she does pose a danger as well as a risk of

24   flight if the Court were to release her.

25        **THE COURT:**  Mr. Hall?

**UNREDACTED TRANSCRIPT**

1          **MR. HALL:**  Thank you, Your Honor.

2          Your Honor, I would just state first that a

3    review of Ms. Ellis's record absolutely indicates that there

4    is no propensity toward violence in her past, in her history,

5    and that only -- the only convictions that she has are

6    driving-related offenses, and there have been a few bench

7    warrants issued in the -- I don't know if it was a bench

8    warrant issued, Judge, or if it was a failure to appear for

9    booking and processing.  Actually there was a bench warrant

10   in 2005, 15 years ago, on a driving while license suspended

11   case which ended up with a $65 fine.  Pretty much on every

12   case she had, except in the indecent exposure, it was a small

13   fine and at most two days in jail, one of those for a driving

14   case; but Ms. Ellis is not a violent person, and if you

15   listen to the detective in this case, the detective admitted

16   this is a -- Tim Norman is a TV star on Welcome to Sweetie

17   Pie's which was a five-year series on the Oprah Winfrey

18   Network, and I would submit to the Court it's a very

19   manipulative individual but not someone that's out on the

20   street, you know, in the dark alleys.  This is a prominent TV

21   figure at that time that Ms. Ellis was communicating with,

22   having sex with.  It wasn't like he was in her mind a very

23   dangerous-type, gang-affiliation type individual.

24          So I would submit that he used Ms. Ellis,

25   absolutely used her, and based on the detective's testimony,

**UNREDACTED TRANSCRIPT**

```
 1   there was nothing in this case ever to indicate that

 2   Ms. Ellis knew that there was a $450,000 life insurance

 3   policy taken out by Andre Montgomery by his uncle, Tim

 4   Norman.

 5           The detective admitted that they did not believe

 6   that Ms. Ellis had knowledge of that life insurance policy.

 7   Furthermore, the reason that's important, the detective also

 8   admitted that Ms. Ellis -- or that there was actually a

 9   burglary which had occurred and that Andre Montgomery was a

10   suspect in that burglary apparently that was committed

11   against Tim Norman, his uncle.

12           And mind you, both of these individuals have been

13   on that show, but if there was a burglary and Mr. Norman

14   advised Ms. Ellis that he was attempting to locate Andre

15   Montgomery for the purposes of confronting him about this

16   burglary or obtaining money that was stolen during the

17   burglary, then there would be no reason for Ms. Ellis to

18   believe that this was a murder for hire.  There would be no

19   reason for Mr. Norman -- and I don't think there's any

20   evidence other than assumptions by law enforcement and the US

21   Attorney's Office that Ms. Ellis knew that there was going to

22   be a homicide.  Her statement to these detectives and these

23   agents was that she did not know there was going to be a

24   homicide.

25           She may not have acted in the way that she should
```

**UNREDACTED TRANSCRIPT**

1    have reacted after this happened, and I think the officer

2    said that Ms. Ellis's statements said she heard shots when

3    she drove away.  She didn't respond in the way that she

4    should have responded, but that doesn't change the fact that

5    before she had no knowledge of a homicide.

6               There's just no evidence other than presumptions

7    by law enforcement, and it wouldn't make sense under what we

8    know and what they admit Ms. Ellis would have known at the

9    time that she would have had any indication that Mr. Norman

10   was going to have his nephew, the son of his brother, shot

11   and killed.  She was under the impression, based on her

12   statement to law enforcement, that somebody was going to

13   confront Mr. Norman -- or Mr. Montgomery whenever he was

14   brought out or lured outside of the location that he was at,

15   but at the time she had no knowledge that he was going to be

16   shot.  I don't think there's any evidence of that, and that

17   will be known for a trier of fact, but for Your Honor's

18   purposes of considering the strength or likelihood of

19   conviction, I would state that based on the detective's

20   information, had she known about the insurance policy and

21   that Mr. Norman stood to benefit nearly a half million

22   dollars from Andre Montgomery's death, there would be a

23   different argument and I would be in a far less better

24   position if that were true, but these detectives confirmed

25   that she did not know about the insurance policy.  Therefore,

**UNREDACTED TRANSCRIPT**

1    the real motive here is Mr. Norman's motive to collect on

2    this policy and to have his nephew killed to collect on this

3    policy.  If she didn't know about that, she didn't know about

4    a motive to kill.  She knew about a motive to address Mr.

5    Montgomery regarding a burglary and to try to recuperate

6    money that was taken from a burglary.

7                 Even though she was duped and manipulated by Mr.

8    Montgomery apparently there's no indication that she's a

9    cold-blooded killer or that she had any knowledge that there

10   was going to be a killing.

11                Mr. Norman was a flashy TV star and he gave her

12   $10,000 apparently according to her own admission for her

13   participation, but there's no reason for her to believe that

14   Mr. Montgomery was going to be killed, Your Honor.  I think

15   that -- I know it's going to be a case that will go to trial.

16   These phones that Ms. Ellis told them about and confirmed

17   about, there's not voice recordings on these phone calls,

18   these phones.  These are burner phones, track phones.

19                Ms. Ellis's cooperation did assist the government

20   in this case.  They may believe she's not telling the truth

21   about certain things but her information -- until her

22   confession, Judge, they didn't have any reason to go

23   interrogate her and question her for nearly five years.

24                The first time they show up to her doorstep was

25   2020, on August 17, and she immediately went with an attorney

**UNREDACTED TRANSCRIPT**

1   that was basically brought down from St. Louis and was

2   appointed prior to her arrest which is very unusual.  She

3   wasn't questioned in court about this attorney.  I don't

4   doubt that this is a very capable attorney, but this attorney

5   came down from St. Louis with the agents and Ms. Ellis, the

6   next thing you know, is in an interview room with the FBI and

7   homicide detectives from St. Louis giving basically a

8   confession to her involvement in this case.

9          They didn't have that before her statement to

10  them, and I'm sure the information she provided was helpful,

11  but I think that she will remain.  I think that you can place

12  a tracking monitor device on her, a GPS location device on

13  Ms. Ellis.

14         She has two children that's in the presentence

15  report.  She has a two year-old and a 16 year-old, and we

16  would rely on this.  They're in the custody of her mother at

17  this time, but -- and the two year-old -- I don't know if --

18  she has sickle cell, I believe.  It may be listed -- full

19  blown sickle cell, and it may be listed in this presentence

20  report -- pretrial services report, Judge, but she's not

21  going to run.  And if the Court can put a device on her, on

22  Ms. Ellis, Judge, I think that that will suffice the fear of

23  any flight or anything of that nature.  She's been here the

24  entire time.

25         And it was her practice to go back and forth to

**UNREDACTED TRANSCRIPT**

1   St. Louis on weekends.  She worked at an exotic club there.

2   It wasn't that -- she would come into town and would leave

3   after the weekend.  So the fleeing the jurisdiction part was

4   just -- that was part of her normal routine was to come in

5   and then stay the weekend and then leave.  It happened after

6   that.

7          But I would submit to the Court based on that,

8   Your Honor, I think that there is enough here based on the

9   testimony that Your Honor heard from this detective that can

10  justify setting a bond in this case, Your Honor.  And I thank

11  you for listening to me run on and on there.

12          **THE COURT:**  That's all right, Mr. Hall.

13          Counselors, thank you for your presentations and

14  argument.

15          For the benefit of Ms. Ellis and her family, I

16  want to talk about what we've discussed.  Counsel on both

17  sides has mentioned the presumption.  And I want to be sure

18  that there's some understanding of what we're talking about

19  so it doesn't sound like a lot of inside baseball.

20          Under the Bail Reform Act, it's the burden on the

21  United States if they're seeking the defendant be detained

22  pending a trial in their case.  The burden is on the United

23  States to show that there is no condition or combination of

24  conditions that will reasonably assure the safety of any

25  other person in the community or that the person will not

**UNREDACTED TRANSCRIPT**

1   appear at court as required; and again, that there's no

2   condition or combination of conditions that will assure that.

3          However, when an individual has been charged with

4   certain offenses, Congress has determined that those offenses

5   are so serious that there is a presumption that there don't

6   exist any conditions that will assure the safety of the

7   community and the person's appearance at court.  One of the

8   charges that triggers that presumption is if an individual is

9   charged with an offense for which the penalty is -- the

10  maximum penalty is life or death.  In this case, the minimum

11  penalty is life imprisonment if I'm not mistaken.

12         Mr. Hall, Ms. Parks, am I correct on that?

13         **MR. HALL:**  That's correct, Your Honor.

14         **MS. PARKS:**  That's correct, Your Honor.

15         **THE COURT:**  And so Congress has found that being

16  charged with conspiracy to use interstate commerce facilities

17  in the commission of murder for hire resulting in death is a

18  very serious offense.

19         Let me also say as we discuss the factors that I

20  have to consider under the Bail Reform Act, that at all times

21  by the Court Ms. Ellis is presumed innocent.  I have to make

22  some determinations with regard to strength of evidence and

23  the nature and circumstances of the offense charged, but as I

24  make those statements, I'm not making those statements to say

25  that in any way that I think that she's guilty because I

**UNREDACTED TRANSCRIPT**

46

1    can't -- that's not for me to determine.  Ms. Ellis retains

2    her presumption of innocence until such time as she elects to

3    either change her plea or until such time as a jury of her

4    peers adjudicates guilt.  And so I'm just making findings for

5    purposes of this hearing.

6            The first factor that the Court has to consider

7    is the nature and circumstances of the offense charged.  The

8    offense charged in this case is the conspiracy to use

9    interstate commerce facilities in commission of a murder for

10   hire resulting in death.  I think the facts are well laid out

11   in the indictment in the complaint that preceded it, and

12   again Officer Thurmond -- Investigator Thurmond's testimony

13   effectively what is charged here is that Ms. Ellis was

14   utilized to secure the victim Andre Montgomery's location so

15   that others could come to that location and affect his

16   murder.  The result of that would be by ascertaining his

17   location and securing his placement at that location

18   Ms. Ellis received approximately $10,000 and codefendants

19   received other funds from life insurance policies.

20           That's the offense as charged.  That's the nature

21   and circumstances of the offenses charged.

22           The second prong which Mr. Hall discussed during

23   his argument is the strength of the evidence, and Mr. Hall

24   focused on Ms. Ellis's knowledge of the extent of the

25   conspiracy and her knowledge of I guess everything that was

**UNREDACTED TRANSCRIPT**

47

```
 1    going on certainly with regard to the -- with regard to the

 2    life insurance policies.  I don't believe that the law of

 3    conspiracy in this -- and again, this will be fleshed out

 4    further in the courts in the Eastern District of Missouri,

 5    but it's not my understanding of this that the law of

 6    conspiracy requires Ms. Ellis to know each and every piece

 7    that's going on in every corner of the conspiracy.

 8              I think what Ms. Ellis did know was that she was

 9    to secure Mr. Montgomery's location for others to meet with

10    him for some purpose, and that by securing his location, she

11    would be given $10,000.

12              If your uncle wants to talk to you, even if you

13    did steal $250,000 from him, you probably don't need to pay

14    somebody $10,000 just to secure that meeting.  And so I think

15    it goes without saying that Ms. Ellis knew there was

16    something a little more than uncle wanting to talk to nephew

17    and say, hey, why did you break in my house and steal my

18    money.  And certainly her actions -- I think her unquestioned

19    actions in the wake of what happened -- she was on the scene;

20    she heard the gunshots -- I think given the nature of the

21    individuals involved, I don't think there was any question

22    but that it was well publicized in the three to seven days

23    after her departure from St. Louis that Mr. Montgomery had

24    been murdered.  Then the following day to take the money,

25    deposit it and then within that week time period fly to
```

**UNREDACTED TRANSCRIPT**

1   Los Angeles to meet with the individual who said, hey, can

2   you let me know where my nephew is.  It belies credulity to

3   think that Ms. Ellis was completely in the dark about the

4   full extent of -- I think the essential elements of both what

5   she was a part of which is to secure Mr. Montgomery's

6   appearance for his ultimate demise.

7            So that's my take on the strength of the

8   evidence.  I think the evidence is certainly there to meet

9   the essential elements of the count and is strong to the

10  Government's credit.

11           History and characteristics of the individual,

12  Ms. Ellis -- and one thing that the statute requires the

13  Court to consider are connections to the charging district.

14  And so while Ms. Ellis was in Memphis, has lived in Memphis

15  for a significant part of her life, the question, the

16  connections to the charging district are what I'm required to

17  focus on and my focus there leads me to the Pretrial Services

18  Report which shows that Ms. Ellis advised that she moved from

19  Memphis to St. Louis in 2010 and lived there until

20  coincidentally 2016, which is the year of the homicide.

21           She indicates that she later lived in Atlanta for

22  a year before returning to Memphis where she lived until she

23  moved to Olive Branch, where it appears she was in Olive

24  Branch for about a month prior her arrest.

25           Ms. Ellis is a mother of two children.  She does

**UNREDACTED TRANSCRIPT**

49

1    not have a passport, has never traveled outside of the United

2    States.  Her interactions with law enforcement as Mr. Hall

3    indicated have been fairly minor, I mean, you know, for lack

4    of a better word.  You know, driving without a driver's

5    license, indecent exposure, simple possession, really

6    nothing -- nothing outrageous, but that does not -- when

7    balanced against the seriousness of the offense, that does

8    not mandate a bond.

9            I think most -- one recommendation was that

10   Ms. Ellis be fitted with an ankle monitor and GPS monitoring.

11   Unfortunately, it's my experience that ankle monitors are not

12   difficult to remove, and in a situation where an individual

13   is facing at a minimum life imprisonment, I don't think that

14   an ankle monitor is sufficient condition to balance or to

15   eliminate the risk of flight.

16           Furthermore, Ms. Ellis's admitted conduct in the

17   wake of the events, assuming for sake of argument that

18   Ms. Ellis knew absolutely nothing about what was going to

19   happen, it is certainly of concern that money was received

20   from an individual who at the very least had -- it was more

21   than coincidence that the uncle was looking for the nephew

22   and the nephew winds up dead.  The uncle is giving you a

23   large sum of money to help you find the nephew.  You take

24   that money and rather than saying I can't take this, I'm

25   going to deposit -- and I understand financial factors as a

**UNREDACTED TRANSCRIPT**

1   single mom might have precluded that -- and then further to

2   then say, I'm going to go back and meet you and that there's

3   no contact with law enforcement to say this person that I

4   just saw has been killed and I heard gunshots.  To --

5   certainly one is helpful now that, you know, they've been

6   detained, but there's an opportunity in the ensuing four

7   years to be helpful that was not made, which again from a

8   risk of flight standpoint, from a concern about knowledge of

9   culpability and then whether or not there would be further

10  appearance at court given the significant penalty that's

11  available, the Court finds just that the presumption has not

12  been rebutted.  I know that's not what Ms. Ellis or her

13  family or counsel were hoping to hear, but I think in

14  weighing all the factors that's the determination I have to

15  come to.

16          Ms. Ellis, at this time the Court will order your

17  remand to the custody of the marshals pending further action

18  by the district court in the Eastern District of Missouri.

19  You'll be transported by the marshal service to Missouri for

20  further action in this case.

21          Is there anything else, Mr. Hall, Ms. Parks?

22          **MR. HALL:**  No, Your Honor.

23          **MS. PARKS:**  No, Your Honor.

24          **THE COURT:**  I thank y'all for your appearance

25  this afternoon.

**UNREDACTED TRANSCRIPT**

1          **MS. PARKS:**  Thank you, Your Honor.

2          **THE COURT:**  Good luck to you, Ms. Ellis.

3          (Adjournment.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNREDACTED TRANSCRIPT**

52

1                    **C E R T I F I C A T E**

2

3

4           I, LISA J. MAYO, do hereby certify that the

5  foregoing 52 pages are, to the best of my knowledge, skill

6  and abilities, a true and accurate transcript from my

7  stenotype notes of the ID/REMOVAL/DETENTION HEARING on 2nd

8  day of September, 2020, in the matter of:

9

10

11  United States of America

12  vs.

13  TERICA ELLIS

14

15  Dated this 09.23.2020

16

17

18

19                           _____S/Lisa J. Mayo_____

20                           LISA J. MAYO, LCR, RDR, CRR
                             Official Court Reporter
21                           United States District Court
                             Western District of Tennessee
22

23

24

25

                    **UNREDACTED TRANSCRIPT**